1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8

9
CHAZ HIGGS,                          )
10                                   )
            Petitioner,              )        3:10-cv-00050-RCJ-WGC
11                                   )
vs.                                  )        **ORDER**
12                                   )
DWIGHT NEVEN, *et al.*,              )
13                                   )
            Respondents.             )
14  _____/

15

16          This action is a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, by

Chaz Higgs, a Nevada state prisoner represented by counsel.  This matter comes before the Court on
17
the merits of the petition.
18
**I.  Procedural History**
19
            On September 28, 2006, the State charged Petitioner in Reno Justice Court by criminal
20
complaint with open murder in violation of NRS 200.010 and 200.030.  (Exhibit 2).[1]  Following a
21
preliminary hearing, Petitioner was bound over to the district court for trial.  (Exhibit 14, at p. 136).
22
            On December 12, 2006, the state charged Petitioner in the Second Judicial District Court,
23
County of Washoe, State of Nevada, by information with open murder in violation of NRS 200.010
24
and 200.030.  (Exhibit 16).  Petitioner pleaded not guilty.  (Exhibit 17, at p. 3).
25

26
            [1]  The exhibits referenced in this order are found in the Court's record at ECF Nos. 6-9.

On January 12, 2007, Petitioner filed a pretrial petition for a writ of habeas corpus on the basis that there was insufficient evidence to support the justice court's finding of probable cause. (Exhibit 18).  After briefing and argument, the trial court denied the petition.  (Exhibit 31, at pp. 26-27).

Trial commenced on June 18, 2007.  (Exhibit 87).  After a two-week trial, the jury convicted Petitioner of the first-degree murder of his wife, Kathy Augustine.  (Exhibit 97, at p. 1583).  Following a brief penalty hearing, the jury selected a sentence of life in prison with the possibility of parole after 20 years.  (*Id.*, at pp. 1620-21).  The trial court confirmed the sentence.  (*Id.*, at p. 1623).  Judgment was entered on June 29, 2007.  (Exhibit 98).

Petitioner pursued a direct appeal.  (Exhibit 107).  Petitioner, by way of counsel, filed his opening brief with the Nevada Supreme Court.  (Exhibit 117).  On September 16, 2008, the Nevada Supreme Court issued its unpublished order of affirmance.  (Exhibit 134).  Petitioner filed a petition for rehearing, which was denied.  (Exhibits 137 & 141).  The Nevada Justice Association requested that the court's decision be published, and on January 14, 2010, the Nevada Supreme Court filed a published opinion affirming Petitioner's conviction.  (Exhibit 144; *Higgs v. State*, 126 Nev. ___, 222 P.3d 648 (2010)).  Remittitur issued on February 9, 2010.  (Exhibit 145).

Petitioner filed his federal habeas petition on January 27, 2010.  (ECF No. 1).  The petition contains five grounds for relief.  Petitioner claims that his rights under the United States Constitution were violated because: (1) the trial court denied his request for a continuance; (2) the trial court failed to adopt the standard for admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); (3) the trial court declined to give a spoliation instruction; (4) there is insufficient evidence to sustain his conviction; and (5) he was prejudiced by the cumulative effect of plain errors at trial.  (ECF No. 1).

Respondents previously filed a motion to dismiss certain grounds as unexhausted.  (ECF No. 5).  By order filed March 24, 2011, this Court denied the motion to dismiss and directed the

2

respondents to file an answer to all grounds of the petition.  (ECF No. 17).  Respondents have filed an answer (ECF No. 19) and Petitioner has filed a traverse (ECF No. 22).  The Court now addresses the merits of each claim of the federal petition.

## II. Federal Habeas Corpus Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), at 28 U.S.C. § 2254(d), provides the legal standard for the Court's consideration of this habeas petition:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002).  A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade,* 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000) and citing *Bell v. Cone,* 535 U.S. 685, 694 (2002)).  The formidable standard set forth in section 2254(d) reflects the view that habeas corpus is "'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction

through appeal." *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade,* 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than merely incorrect or erroneous; the state court's application of clearly established federal law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409). In determining whether a state court decision is contrary to, or an unreasonable application of federal law, this Court looks to the state courts' last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001).

In a federal habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the burden set in § 2254(d) and (e) on the record that was before the state court. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011).

**III. Discussion**

   **A. Ground 1**

Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial and due process were violated by the trial court's denial of a continuance. (ECF No. 1, at pp. 3, 18-34). On direct appeal, the Nevada Supreme Court addressed this issue as follows:

> Higgs argues that the district court violated his rights under the Fifth, Sixth, and Fourteenth Amendments when it denied his motion to continue the trial. He asserts that his defense expert did not have adequate time to evaluate the conclusions of the FBI's toxicology

4

report that confirmed the presentence of succinylcholine in Augustine's urine.  Specifically, he asserts that FBI toxicologist Montgomery defied the court order instructing her to provide discovery.  Without the full FBI report, Higgs argues that his expert witness, Chip Walls, could not testify as to the validity of the FBI report and the defense could not adequately cross-examine Montgomery.

"This court reviews the district court's decision regarding a motion for continuance for an abuse of discretion."  Rose v. State, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007).  Each case turns on it own particular facts, and much weight is given to the reasons offered to the trial judge at the time the request for a continuance is made.  Zessman v. State, 94 Nev. 28, 31, 573 P.2d 1174, 1177 (1978).  This court has held that generally, a denial of a motion to continue is an abuse of discretion if it leaves the defense with inadequate time to prepare for trial.  See id.  In other instances, we have held that a denial of a motion to continue was an abuse of discretion if "a defendant's request for a modest continuance to procure witnesses . . . was not the defendant's fault."  Rose, 123 Nev. at 206, 163 P.3d at 416.  However, if a defendant fails to demonstrate that he was prejudiced by the denial of a continuance, then the district court's decision to deny the continuance is not an abuse of discretion.  Id.

We conclude that the district court did not abuse its discretion when it denied Higgs' motion to continue the trial because Higgs has failed to demonstrate that he was prejudiced by the denial.

By defense counsel's own admission, there was no explanation for the delay in asking for more information regarding the FBI's toxicology report.  Higgs' expert witness, Chip Walls, had approximately six months to question, evaluate, and determine whether additional information about the toxicology report would be necessary for his consideration.  During the hearing on the motion to continue, the State explained that Walls had received the toxicology report on December 7, 2006, yet Higgs failed to ask for additional information about the report until May 2007.  In regard to the delay, defense counsel stated, "The fault, unfortunately, really doesn't lie anywhere."  Defense counsel, Walls, the State, and Montgomery all worked together to compile the list of materials, which constituted part of the discovery orders signed by Judge Polaha.  In addition, Montgomery spoke to Walls on the phone.  Walls later testified that during that phone conversation, the two exchanged information and Montgomery answered his questions.  Walls admitted that he could have asked Montgomery more specific questions and she would have answered them, but he chose not to ask additional questions.  Walls confirmed that he and Montgomery exchanged information and all that was left was for him to "complete [his] thoughts with her."  The additional information that Montgomery compiled for Walls had to be cleared by the FBI's attorneys before it could be sent to Walls.  Accordingly, we

5

conclude that there is no evidence in the record supporting Higgs'
contention that Montgomery violated the district court's discovery
order.  Rather, substantial evidence on the record shows that
Montgomery was cooperative with the defense.

We further observe that on the morning of June 18, 2007, before the
beginning of trial, Walls testified extensively during a motion-in-
limine hearing regarding expert witness testimony.  He testified about
succinylcholine in general and the difficulties of testing the substance,
as well as the problems with testing urine samples for succinylcholine.
Walls' testimony was thoughtful and thorough; he explained the
aspects of the FBI testing he agreed with and the aspects he
questioned.  Perhaps most importantly, Walls testified that while he
had some reservations regarding the FBI's methodology, he agreed
with the findings of Montgomery's toxicology report.

Higgs does not offer any reason why Walls did not testify at trial as he
did at the hearing on the motion in limine.  However, Walls' testimony
during the motion-in-limine hearing supplied Higgs the discovery
necessary to conduct an effective cross-examination of Montgomery.
See Pantano v. State, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006)
(observing that "'the Confrontation Clause guarantees an opportunity
for effective cross-examination, not cross-examination that is effective
in whatever way, and to whatever extent, the defense might wish'"
(quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986))).
Moreover, by defense counsel's own statements at the continuance
hearing, Walls had known for weeks that the FBI lab machine that
Montgomery had used had malfunctioned at one point.  The evidence
on the record shows that the discovery available to Higgs at the time of
trial met constitutional guarantees of an opportunity to effectively
cross-examine Montgomery, and therefore, we conclude that Higgs
was not prejudiced by the district court's denial of the motion to
continue.

We also note that Higgs had a number of other opportunities before
trial to seek a continuance because he needed more time to evaluate the
toxicology report.  The district court held several pretrial hearings on
other motions during which Higgs could have again asked for more
time.  Specifically, the district court held a hearing on June 8, 2007, to
confirm the trial date, during which Higgs' defense counsel expressly
stated, "We'll be ready on June 18th."

We make a final observation with regard to the motion to continue.  It
was based on the defense's need for more time to investigate evidence
relating to the cause of death.  This court has held that cause of death
can be shown by circumstantial evidence.  West v. State, 119 Nev.
410, 416, 75 P.3d 808, 812 (2003).  A denial of a motion to continue to
allow the defense to investigate a report as to the cause of death is not
prejudicial when the State could prove cause of death with other
circumstantial evidence.  Even if Higgs had more time to investigate

6

1        the FBI toxicology report, it would not change the fact that the State
         had enough circumstantial evidence to prove Augustine's cause of
2        death.

3        We therefore conclude that the district court did not abuse its
         discretion when it denied Higgs' motion to continue the trial because
4        Higgs fails to demonstrate that any prejudice resulted from the denial.

5    Exhibit 144, at pp. 9-13; *Higgs*, 126 Nev. at ___, 222 P.3d at 653-54 (emphasis in original).

6    Petitioner filed a motion for rehearing, contending that the Nevada Supreme Court had

7    misapprehended material facts and law in rendering its decision. (Exhibit 137). The Nevada

8    Supreme Court denied the petition:

9        In the petition for rehearing, Higgs contends that the district court's
         denial of the motion to continue violated his constitutional rights.
10       Higgs asserts that the majority misapprehended the material fact that
         FBI toxicologist and State expert witness Madeline Montgomery
11       "flouted" a district court discovery order that she turn over her
         toxicology report. Citing the dissent, Higgs contends that
12       Montgomery's refusal to turn over her full toxicology report impinged
         on his Sixth Amendment right to confrontation. Higgs misstates the
13       facts and the law.

14       This court's order of affirmance did not misapprehend the material
         facts. Our review of the following material facts demonstrates that
15       Montgomery did not "flout" the district court's discovery order. By
         defense counsel's own statements in court and the motion in limine
16       testimony of defense expert Chip Walls, the FBI sent Walls its
         toxicology report in December 2006, 24 weeks before the trial date.
17       Four weeks before trial, in May 2007, Walls informed defense counsel
         that he needed additional information. By defense counsel's own
18       admission, there was no explanation for the delay in asking for more
         information. At the hearing on the motion to continue, defense
19       counsel stated, "The fault, unfortunately, really doesn't lie anywhere."
         Defense counsel, Walls, the State, and Montgomery all worked
20       together to compile the list of materials, which constituted part of the
         discovery order signed by Judge Polaha. In addition, Montgomery
21       spoke to Walls on the phone. Walls later testified that during that
         phone conversation, the two exchanged information and Montgomery
22       answered his questions. The additional information that Montgomery
         compiled for Walls had to be cleared by the FBI's attorneys before it
23       could be sent to Walls. Accordingly, we conclude that there is no
         evidence on the record suggesting that Montgomery violated a
24       discovery order. Rather, substantial evidence on the record shows that
         Montgomery was cooperative with Higgs and Walls.

25

26

                                        7

The majority's order did not misapprehend the law. It correctly concluded that the denial of the motion to continue did not violate Higgs' Sixth Amendment right to confrontation.

On the morning of June 18, 2007, before beginning trial, Walls testified extensively during a motion in limine hearing. Walls testified thoughtfully and thoroughly regarding Montgomery's FBI toxicology report, testifying as to what parts he agreed with and what parts he questioned. Walls further testified about succinylcholine in general, the difficulties of testing the substance, as well as the problems with testing urine samples for succinylcholine. Walls testified that he had spoken to Montgomery and she had answered his questions. In addition, Montgomery told Walls that she would put another package together for him but it would have to get cleared through the FBI lawyers before it was released. Walls admitted that he could have asked Montgomery more specific questions and she would have answered them, but he chose not to ask additional questions. He confirmed that he and Montgomery exchanged information and all that was left was for him "to complete [his] thoughts with her." Perhaps most importantly, Walls testified that while he had some reservations regarding the FBI's methodology, he <u>agreed</u> with the findings of Montgomery's toxicology report.

Higgs does not offer any reason why Walls did not testify at trial as he did at the motion in limine. Armed with only the information that Walls testified to during the motion in limine hearing, there is no question that Higgs had the discovery necessary to conduct an effective cross-examination of Montgomery. See <u>Pantano v. State</u>, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006) (observing that "'the Confrontation Clause guarantees an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish'" (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986))). Moreover, by defense counsel's own statements at the continuance hearing, he had known for weeks that the FBI lab machine that Montgomery had used had malfunctioned at one point. Therefore, months before the trial date, defense counsel had the discovery necessary for an effective cross-examination of Montgomery. Additionally, it had a State-appointed, well respected expert, Walls, who could effectively testify as to the deficiencies of the FBI's toxicology report – Walls was present on the first day of trial and testified extensively at a motion in limine hearing that morning. The evidence on the record shows that the discovery available to Higgs at the time of trial met constitutional guarantees of an opportunity to effectively cross-examine Montgomery.

Higgs further assigns error to the majority's conclusion that he could have renewed his motion for continuance at a pretrial hearing. In so holding, Higgs argues that the majority overlooks <u>Richmond v. State</u>, 118 Nev. 924, 59 P.3d 1249 (2002). He contends that a failure to grant a continuance cannot be justified by his failure to renew the motion at

8

another date.  Higgs asserts that the denial of the motion to continue was with prejudice and therefore there was nothing more to be done. Not only does Higgs misstate the majority's conclusion, but Richmond is wholly inapposite.

In its order affirming the district court, the majority states that "Higgs could have sought additional time to review the evidence at the motion in limine but failed to do so."  Higgs v. State, Docket No. 49883 (Order of Affirmance, May 19, 2009).  First, we take this opportunity to note that this point was more an observation than a holding.  It follows the substantive discussion regarding why the majority did not find that it was an abuse of discretion when the district court denied the motion to continue.  The majority does not state, nor can it be logically implied from the observation, that there was no abuse of discretion simply because Higgs never raised the issue again.  To the contrary, the order makes it clear that the majority noted that Higgs did not again ask the court for additional time.

In addition, Higgs' reliance on Richmond is misplaced.  In Richmond, this court held "where an objection has been fully briefed, the district court has thoroughly explored the objection during a hearing on a pretrial motion, and the district court has made a definitive ruling, then a motion in limine is sufficient to preserve an issue for appeal." 118 Nev. at 932, 59 P.3d at 1254.  Richmond was, therefore, concerned with the preservation of issues for appeal.  It did not, either expressly or impliedly, discuss the futility of renewing motions before the district court.  As the majority correctly opined, there was nothing to prevent Higgs from asking again for more time.

In addition, Higgs fails to point out that the district court held a hearing on June 8, 2007, to confirm the trial date, during which Higgs' defense counsel expressly stated, "We'll be ready on June 18th."  Moreover, the record does not support Higgs' argument that the denial of the continuance was with prejudice.  Nowhere in its ruling did the district court judge use those words; he merely concluded by stating, "I don't want to grant an extension . . . I do not believe that the interests of justice in this case will be furthered by a continuance."  Therefore, we conclude that Higgs misstates the facts and the law as to his argument that this court overlooked Richmond.

Higgs argues that the denial of the motion to continue deprived him due process because it resulted in the exclusion of key evidence in the form of Walls' testimony.  Higgs' contention fails.

As we have discussed above, Walls was present, able, and willing to testify at trial.  He was present the morning of the first day of trial and testified extensively to his expertise, opinion, and conclusions as to succinylcholine and the FBI toxicology report.  Walls testified that he had a few follow-up questions for Montgomery – questions which arose from his one-on-one phone conversation with her.  Higgs'

1

2

3

4

> decision not to put Walls on the stand at trial was just that – his decision.  Further, Higgs has not put forth any evidence alleging that he could not secure other evidence or testimony due to the lack of time.  Accordingly, Higgs' argument, that the denial of the motion to continue deprived him of due process because it prevented him from presenting important circumstantial evidence, is without merit.

(Exhibit 141, at pp. 2-7) (emphasis in original).

5

6

Petitioner presents the arguments of the two justices of the Nevada Supreme Court who

7

dissented from the affirmance of his conviction.  (ECF No. 1, at pp. 29-34).  Petitioner argues that

8

the denial of his request for a continuance violated his constitutional rights because it denied him

9

"potentially crucial evidence" and "had an adverse affect on [his] presentation of the case."  *(Id.*, at

10

pp. 29, 33).  Petitioner argues that the Nevada Supreme Court's decision is contrary to *California v.*

11

*Trombetta*, 467 U.S. 479, 485 (1984) (criminal defendants must be provided a meaningful

12

opportunity to present a complete defense); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)

13

("Few rights are more fundamental than that of an accused to present witnesses in his own

14

defense."); and *Kyles v. Whitley*, 514 U.S. 419 (1995) (once a court finds a *Brady* error, "there is no

15

need for further harmless error review").

16

The Nevada Supreme Court rejected Petitioner's assertion that this case involved the

17

violation of a discovery order or the withholding of evidence.  (Exhibit 144, at p. 11).  Both the state

18

district court and the Nevada Supreme Court detailed the time line of discovery and noted that the

19

defense's expert was provided with the State's expert's report six months before trial, but waited just

20

weeks before trial to declare that he needed additional information.  (Exhibit 56, at p. 18; Exhibit

21

144, at p. 11).  The Nevada Supreme Court found that the defense expert had an opportunity to

22

obtain further information by questioning the State's expert during a telephone conversation, but

23

failed to take advantage of that opportunity.  (Exhibit 144, at p. 11).  The Nevada Supreme Court

24

pointed out that only ten days before trial, and three weeks after filing the motion to continue,

25

defense counsel stated that he was ready to proceed.  (Exhibit 144, at pp. 12-13).  Both the state

26

district court and the Nevada Supreme Court found that there was sufficient discovery available to

10

1   Petitioner and his defense expert to allow the defense expert to challenge the State's expert witness

2   and provide for effective cross-examination.  (Exhibit 56, at pp. 18-19; Exhibit 144, at pp. 11-12;

3   Exhibit 141 at p. 4; *see* Exhibit 87, at pp. 9-22) (cross-examination of State's witness Dr. William H.

4   Anderson during motions hearing); Exhibit 88, at pp. 12-35 (testimony of defense expert Dr. H. Chip

5   Walls during motions hearing)).  Notably, the Nevada Supreme Court found that the defense's expert

6   ultimately agreed with the State's expert regarding the presence of succinylcholine in the victim's

7   urine.  (Exhibit 144, at p. 4; *see* Exhibit 88, at pp. 24, 29 (pre-trial testimony of Dr. Walls)).  The

8   Nevada Supreme Court determined that Petitioner was not prejudiced based on its finding that,

9   absent its expert witness, the State still had enough circumstantial evidence to prove the cause of

10  death.  (Exhibit 144, at p. 13).

11          The factual findings of the state court are entitled to a presumption of correctness.  28 U.S.C.

12  § 2254(e)(1); *see Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state

13  appellate court findings – including those that interpret clear or ambiguous trial court findings – are

14  entitled to the same presumption of correctness that [is afforded to] trial court findings.").  This

15  presumption can be overcome only by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

16  Petitioner fails to show by clear and convincing evidence that the state court findings were

17  erroneous.  Petitioner offers nothing more than argument and unsupported statements.  (ECF No. 1,

18  at pp. 18-34).

19          In light of the state court findings, the Nevada Supreme Court's decision was not an

20  unreasonable application of *Chambers, Trombetta, or Kyles*.  In *Chambers*, the United States

21  Supreme Court found a due process violation where the trial court had applied a state law that

22  precluded a defendant from treating a defense witness as adverse and cross-examining the witness

23  regarding the witness's out-of-court statements.  410 U.S. at 284.  The Court determined that the

24  mechanical application of evidentiary rules is not appropriate "where constitutional rights directly

25  affecting the ascertainment of guilt are implicated."  *Id.* at 302.  The Court specified that it was not

26

11

1    signaling any "diminution in the respect traditionally accorded to the States in the establishment and

2    implementation of their own criminal trial rules," but held that "under the facts and circumstances of

3    this case the rulings of the trial court deprived [the defendant] of a fair trial." *Id.* at 302-03.  The

4    present case is distinguishable from *Chambers*.  Petitioner was not precluded from cross-examining

5    any witness.  His own expert was ready and willing to testify, as shown by his pretrial testimony

6    (Exhibit 88, at pp. 12-35) but was not called as a witness by the defense.  (*See* Exhibit 144, at p. 12).

7    The denial of the continuance was not based on the mechanical application of an evidentiary rule.

8    Rather, it was based on the trial court's determination that, in light of the circumstances, a

9    continuance was unnecessary.  (*See* Exhibit 56, at pp. 18-19).

10          In *Trombetta*, the United States Supreme Court determined that the Fourteenth Amendment

11   did not require states to preserve breath samples in order for the results of breath analysis tests to be

12   admissible at trial.  467 U.S. at 481.  The Court decided that "[w]hatever the duty the Constitution

13   imposes on the States to preserve evidence, that duty must be limited to evidence that might be

14   expected to play a significant role in the suspect's defense." *Id.* at 488.  To meet this standard, the

15   evidence in question "must both possess an exculpatory value that was apparent before the evidence

16   was destroyed, and be of such a nature that the defendant would be unable to obtain comparable

17   evidence by other reasonably available means." *Id.* at 489.  Neither condition is met on the facts of

18   the instant case.  Even if Petitioner's claim that he was improperly denied a continuance can be

19   morphed into a claim that the prosecution withheld evidence, that evidence was not destroyed, it was

20   not exculpatory, and it was reasonably available by other means.  Therefore, it was immaterial for

21   constitutional purposes. *See id.*

22          The Court in *Kyles* stated that once a reviewing court has found a constitutional violation of

23   *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, "there is no need for further harmless-error

24   review."  514 U.S. at 435.  This rule means that once a successful *Brady* claim is made, prejudice has

25   already been shown. *Id.*  Petitioner argued before the Nevada Supreme Court that the trial court

26

erred by denying a continuance – not that the prosecution had withheld material evidence.  (*See* Exhibit 117, at pp. 12-20).  To the extent that Petitioner raised a *Brady* claim on rehearing, the Nevada Supreme Court rejected it.  (Exhibit 141, at pp. 2-3).  The Nevada Supreme Court found no withholding of evidence by the prosecution.  (Exhibit 144, at p. 11; Exhibit 141, at pp. 2-3).  And, even assuming that evidence was withheld, the Nevada Supreme Court's determination that there was no prejudice renders that evidence immaterial for *Brady* purposes.  *See U.S. v. Bagley*, 473 U.S. 667, 682 (1985) ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

Petitioner further argues that the Nevada Supreme Court's decision was an unreasonable application of *Ungar v. Sarafite*, 376 U.S. 575 (1964).  In *Ungar*, the United States Supreme Court stated that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  376 U.S. at 589.  The Nevada Supreme Court's decision did not run afoul of the rule announced in *Ungar*.  The Nevada Supreme Court did not, as Petitioner suggests, apply a mechanical test when reviewing the denial of the motion to continue, but instead examined the particular circumstances of Petitioner's motion before concluding that the district court had not abused its discretion.  (Exhibit 144, at pp. 9-13; Exhibit 141, at pp. 2-7).

Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Federal habeas relief is denied as to Ground 1 of the petition.

/ / /

/ / /

13

**B. Ground II**

In Ground Two of the federal petition, Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial and due process of law were violated by the trial court's failure to adopt the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and apply them to the expert testimony admitted in this case.  (ECF No. 1, at pp. 4-5, 34-43).  Petitioner raised this claim on direct appeal to the Nevada Supreme Court.  The Nevada Supreme Court found the claim to lack merit, ruling as follows:

> Higgs next contends that the district court abused its discretion when it allowed Montgomery to testify about the presence of succinylcholine in Augustine's urine.  In so doing, he does not contend that the district court was incorrect in admitting the testimony under Nevada law. Rather, Higgs invites this court to adopt the standard of admissibility for expert testimony established in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), under which he asserts that Montgomery's testimony is inadmissible.  Because the admissibility of expert witness testimony post-Daubert has resulted in considerable confusion and controversy, we determine it necessary to revisit the opinion, its history, and its trajectory.
>
> * * *
>
> [T]o the extent that Daubert espouses a flexible approach to the admissibility of expert witness testimony, this court has held it is persuasive.  Hallmark v. Eldridge, 124 Nev. ___, ___, 189 P.3d 646, 650 (2008).  But, to the extent that courts have construed Daubert as a standard that requires mechanical application of its factors, we decline to adopt it.  We see no reason to limit the factors that trial judges in Nevada may consider when determining expert witness testimony admissibility.  As evidenced by the amicus brief filed by the Nevada Justice Association, Hallmark appears to have been interpreted as an inferential adoption of Daubert.  While in our view Hallmark demonstrates an adherence to Nevada's standard for admissibility of expert testimony, we concede that the language in that decision may be misleading.  Specifically, the decision states that this court has construed NRS 50.275 to track FRE 702, and then explains that Daubert is persuasive authority.  Hallmark, 124 Nev. at ___, 189 P.3d at 650.  It is reasonable to construe this portion as an endorsement, if not adoption, of Daubert.  For that, we are critical of that decision. Hallmark was not intended to cause confusion and cast doubt on the standard of expert testimony in Nevada.  To the contrary, the opinion was meant to clarify the rule that in Nevada NRS 50.275 is the blueprint for the admissibility of expert witness testimony.

1       In Hallmark, we stated that Daubert and federal court decisions
discussing it "may provide persuasive authority." Hallmark, 124 Nev.

2    at ___, 189 P.3d at 650. We did not, however, and do not today, adopt
the Daubert standard as a limitation on the factors that a trial judge in

3    Nevada may consider. We expressly reject the notion that our decision
in Hallmark inferentially adopted Daubert or signaled an intent by this

4    court to do so.

5                      * * *

6       We hold that NRS 50.275 provides the standard for admissibility of
expert witness testimony in Nevada.

7

8       With those principles in mind, we now turn to whether the district
court abused its discretion in allowing Montgomery to testify as an

9    expert witness. We first consider whether Montgomery was qualified
to testify as an expert witness. Among the factors the court may have

10    considered in determining Montgomery's qualifications were whether
she had formal schooling, proper licensure, employment experience,

11    and practical experience and specialized training. See Hallmark, 124
Nev. at ___, 189 P.3d at 650-51.

12       Montgomery had a science degree, was employed with the FBI's
toxicology department, and had acquired specialized knowledge and

13    training with regard to succinylcholine testing. Accordingly, we
conclude that the district court acted within its discretion when it found

14    that Montgomery met the qualification requirement.

15       Next, we consider whether Montgomery's testimony assisted the jury
to understand the evidence or to determine a fact in issue. We have

16    explained that expert witness testimony "will assist the trier of fact
only when it is relevant and the product of reliable methodology. Id. at

17    ___, 189 P.3d at 651 (citations omitted). While each case turns upon
varying factors, as discussed above, in Hallmark, we articulated five

18    factors to judge reliability of a methodology, instructing the district
court to consider whether the proffered opinion is

19

20           (1) within a recognized field of expertise; (2) testable
           and has been tested; (3) published and subjected to peer

21           review; (4) generally accepted in the scientific
           community (not always determinative); and (5) based

22           more on particularized facts rather than assumption,
           conjecture, or generalization.

23    Id. at ___, 189 P.3d at 651-52 (citations omitted).

24       We conclude that the district court did not abuse its discretion when it
found that Montgomery's testimony would assist the jury.

25    Montgomery is part of a small group of toxicologists in the country
with experience in testing for succinylcholine. In addition, she had

26

1    ongoing training in the field, and had authored dozens of publications
     and given numerous presentations on matters relevant to her field.
2    Montgomery's work was testable although it is unclear whether it had
     been tested.  The record does not contain evidence as to whether
3    Montgomery's work had been subject to peer review.  And, while it is
     unclear the scope of acceptance that Montgomery's methodology has
4    in the scientific community, Walls testified in the pretrial hearings that
     he did not take issue with her methodology or results.  While the
5    testing methodology used by Montgomery did not meet all the
     Hallmark factors for assessing reliability, those factors may be
6    afforded varying weights and may not apply equally in every case.  It is
     up to the district court judge to make the determination regarding the
7    varying factors as he or she is the gatekeeper – not this court.  In this
     case, we determine that the district court acted within its discretion
8    when it found that Montgomery's testimony would assist the jury in
     understanding the evidence and determining a fact in issue.
9
     Lastly, we consider whether the district court correctly determined that
10   Montgomery's testimony met the limited scope requirement.  We
     conclude that it did because Montgomery's testimony consisted almost
11   entirely of the highly particularized facts of testing Augustine's tissues
     and urine samples for succinylcholine.  She explained the testing
12   procedures for succinylcholine and the drug's volatile nature.
     Accordingly, Montgomery's testimony was limited to matters within
13   the scope of her knowledge.  In sum, as Montgomery had scientific and
     specialized knowledge, her testimony assisted the jury in
14   understanding succinylcholine, and it was limited to her knowledge
     and expertise, we conclude that the district court did not abuse its
15   discretion when it allowed Montgomery to testify.

16   Exhibit 144, at pp. 16-28; *Higgs*, 126 Nev. at ___, 222 P.3d at 655-60.  Petitioner filed a motion for

17   rehearing, contending that the Nevada Supreme Court had misapprehended material facts and law in

18   rendering its decision.  (Exhibit 137).  The Nevada Supreme Court denied the petition, as follows:

19   Higgs once again asks this court to adopt Daubert v. Merrell Dow
     Pharmaceuticals, Inc., 509 U.S. 579 (1993).  In his petition for
20   rehearing, Higgs cloaks the argument in the guise that this court
     misapprehended a controlling issue of law to get around the rule that
21   he cannot use the rehearing to reargue matters already considered and
     decided.
22
     Higgs contends that this court misapplied its own standard for expert
23   witness testimony articulated in Hallmark v. Eldridge, 124 Nev. ___,
     189 P.3d 646 (2008).  Specifically, Higgs asserts that this court
24   confused the Hallmark "assistance" requirement for the admission of
     expert witness testimony with the "qualified" requirement.  We note
25   that in his opening brief, Higgs conceded that pursuant to Nevada's
     current law, Montgomery was qualified to testify as an expert witness.

26

16

Now, Higgs again concedes that she is "qualified," has "specialized knowledge," and testified to matters "within the scope of her knowledge," but argues that her testimony did not assist the trier of fact because it was not reliable.  Higgs' contentions are meritless and misapprehend the law.

This court applied NRS 50.275 and Hallmark in concluding that the district court did not abuse its discretion in allowing Montgomery to testify regarding the succinylcholine found in Kathy Augustine's body.  In Hallmark, this court stated that "[i]f a person is qualified to testify as an expert under NRS 50.275, the district court must then determine whether his or her testimony will assist the trier of fact in understanding the evidence or determining a fact in issue."  124 Nev. ___, 189 P.3d at 651 (emphasis added).  As an initial point, we observe that Higgs is incorrect in stating that Hallmark does not stand for an "assistance" requirement because the express language of the opinion states otherwise.

In Hallmark, this court explained what it meant by assistance: "An expert's testimony will assist the trier of fact only when it is relevant and the product of reliable methodology."  Id.  This court then articulated five criteria to judge reliability of a methodology, instructing the district court to consider whether the proffered opinion is

> (1) within a recognized field of expertise; (2) testable and has been tested; (3) published and subjected to peer review; (4) generally accepted in the scientific community (not always determinative); and (5) based more on particularized facts rather than assumption, conjecture, or generalization.

124 Nev. ___, 189 P.3d at 651-52 (citations omitted).

We conclude that Montgomery and her testimony met the Hallmark criteria for assistance.  Montgomery and Walls are part of a small but recognized group of experts in the field of succinylcholine and its testing.  Montgomery's work was testable – it is unclear whether it had been tested.  The record does not contain evidence as to whether Montgomery's work had been subject to peer review.  And, while it is unclear the scope of acceptance that Montgomery's testing of succinylcholine has in the scientific community, Walls testified that he did not take issue with her methodology or results.  Lastly, Montgomery's testimony concerned almost entirely the highly particularized facts of testing Augustine's tissue and urine samples for succinylcholine.  Accordingly, Montgomery's testimony assisted the jury in understanding a drug that, by its very nature, is highly volatile and reactive.  We therefore applied the correct standard in holding that the district court acted within its discretion when it allowed Montgomery to testify as an expert witness for the State.

17

1    (Exhibit 141, at pp. 7-9) (emphasis in original).

2          Petitioner claims that the Nevada Supreme Court's decision was an unreasonable application

3    of *Zafiro v. United States*, 506 U.S. 534 (1993) and *United States v. Scheffer*, 523 U.S. 303 (1998).

4    Petitioner cites these cases for general rules that were not essential to their holdings.  *Zafiro* involved

5    a severance issue.  506 U.S. at 535.  In its opinion, the United States Supreme Court reiterated that

6    "'[a]n important element of a fair trial is that a jury consider *only* relevant and competent evidence

7    bearing on the issue of guilt or innocence.'"  *Id.* at 540 (alteration and emphasis in original) (quoting

8    *Bruton v. U.S.* , 391 U.S. 123, 131 n.6 (1968)).  In *Scheffer*, the United States Supreme Court

9    discussed the constitutionality of Military Rule of Evidence 707, a rule excluding polygraph

10   evidence at trials.  523 U.S. at 309.  In so doing, the Court stated that "State and Federal

11   Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented

12   to the trier of fact in a criminal trial."  *Id.* at 309.  Neither of these cases requires the Nevada

13   Supreme Court to apply the *Daubert* standard.  As such, the Nevada Supreme Court's decision was

14   not an unreasonable application of these cases.  The Nevada Supreme Court, applying Nevada law,

15   determined that the evidence at issue in this case was admissible.  (Exhibit 144, at pp. 26-28; *Higgs*,

16   126 Nev. ___, 222 P.3d at 659-60; Exhibit 141, at pp. 7-9).

17         To the extent that Petitioner argues that the testimony of the State's expert, Montgomery, did

18   not satisfy the requirements of the federal standards set forth in *Daubert* or *Frye*, his argument is

19   irrelevant.  Neither standard is based upon or required by the United States Constitution.  *See*

20   *Daubert*, 509 U.S. at 597 (interpreting the Federal Rules of Evidence); *Frye*, 293 F. at 1013-14.

21   Neither standard is applicable in Nevada state courts.  *See Hallmark*, 124 Nev. at ___, 189 P.3d at

22   650 ("The statute governing the admissibility of expert testimony in Nevada district courts is NRS

23   50.275.").

24         Regarding Petitioner's argument that Montgomery's testimony failed to satisfy the

25   requirements of *Hallmark*, and that the Nevada Supreme Court's rejection of this claim on rehearing

26

18

constituted an unreasonable determination of the facts, Petitioner's *Hallmark* claim is not cognizable

in a federal habeas petition because it is a claim that evidence – the challenged expert testimony –

was improperly admitted under state law.  Unless an issue of federal constitutional law is implicated

by the facts presented, a claim that evidence was improperly admitted under state rules of evidence is

not cognizable in federal habeas corpus.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A state

law issue cannot be mutated into one of federal constitutional law merely by invoking the specter of

a due process violation.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996), *cert. denied*, 522

U.S. 881 (1997).  The Nevada Supreme Court applied state law and determined that the evidence

admitted against Petitioner satisfied the "assistance" requirement of *Hallmark* that evidence be both

relevant and the product of reliable methodology.  (Exhibit 141, at p. 8).  Petitioner is foreclosed

from challenging the state court's application of this state evidentiary rule in federal court.  *See*

*Estelle*, 502 U.S. at 67-68.  Petitioner fails to identify any United States Supreme Court decision

holding or otherwise rendering the *Hallmark* standard unconstitutional.

Finally, the factual findings of the state court are presumed correct.  28 U.S.C. § 2254(e)(1).

Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was

contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the United States Supreme Court, or that the ruling was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  Federal

habeas relief is denied as to Ground 2 of the petition.

**C.  Ground 3**

Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights to due process and a

fair trial were violated by the trial court's refusal to instruct the jury on the spoliation of evidence.

(ECF No. 1, at pp. 5-6, 43-53).  Petitioner raised this claim on direct appeal and the Nevada Supreme

Court rejected the claim, ruling as follows:

> Higgs contends that the district court abused its discretion when it
> refused to give Higgs' proffered spoliation instruction regarding the

19

State's alleged failure to properly preserve evidence of an injection site tissue sample from Augustine's body. Higgs urges this court to apply the spoliation rule set forth in Bass-Davis v. Davis, 122 Nev. 442, 452-53, 134 P.3d 103, 109-10 (2006), to criminal cases. In Bass-Davis, a civil case, this court determined that even when missing evidence is not willfully destroyed, but rather is negligently destroyed, the party prejudiced by the loss of evidence is entitled to an "adverse inference instruction." Id.

We reject Higgs' suggestion that we extend the spoliation rule set forth in Bass-Davis to criminal cases. This court has articulated the rule for failure to preserve evidence in criminal cases, and we see no reason to depart from that standard.

"Due process requires the State to preserve material evidence." Steese v. State, 114 Nev. 479, 491, 960 P.2d 321, 329 (1998). The State's failure to preserve material evidence can lead to dismissal of the charges "if the defendant can show 'bad faith or connivance on the part of the government' or 'that he was prejudiced by the loss of the evidence.'" Daniels v. State, 114 Nev. 261, 267, 956 P.2d 111, 115 (1998) (quoting Howard v. State, 95 Nev. 580, 582, 600 P.2d 214, 215-16 (1979). Moreover, district courts have "broad discretion to settle jury instructions." Cortinas v. State, 124 Nev. ___, ___, 195 P.3d 315, 319 (2008). Our review is, therefore, limited to inquiring whether there was an abuse of discretion or judicial error. Id.

In the present case, Higgs proffered three different adverse-inference jury instructions regarding spoliation of evidence. He asserted that the jury instructions were necessary because the State inadequately inspected and preserved the tissue sample from an injection site on Augustine's body. We disagree.

The district court properly rejected Higgs' proffered jury instructions because there was no evidence that the State acted in bad faith, and Higgs failed to show he was prejudiced by the State's failure to preserve the tissue sample. First, Higgs does not argue that the State acted in bad faith, but that it was negligent in its preservation of the tissue sample. With no issue raised as to bad faith, nor any evidence supporting such a determination, we need only consider if Higgs was prejudiced by the spoliation.

We determine that Higgs was not prejudiced by the spoliation of the tissue sample because the State did not benefit from its failure to preserve the evidence. See Sanborn v. State, 107 Nev. 399, 408, 812 P.2d 1279, 1286 (1991) (in holding that defendant was prejudiced by the State's failure to preserve evidence, the court explained that the State's case was "buttressed by the absence of [the] evidence"). The State's forensic toxicologist, Dr. Clark, admitted that she could not confirm that the tissue sample was from the site at which the succinylcholine was administered. More importantly, the defense's

20

1
2
3
4
5
6

> forensic toxicologist, Dr. Sohn, testified that while he could not retest the tissue sample to date it, he did examine it microscopically.  He stated that his microscopic examination, along with the autopsy pictures of the site led him to conclude – with medical certainty – that the wound could not have been inflicted before Augustine was admitted to the hospital.  The failure to preserve the tissue sample prevented Dr. Sohn from dating the tissue sample, not from forming a medical conclusion in support of Higgs' defense that he did not inject his wife with succinylcholine.  Accordingly, Higgs was not prejudiced by the State's failure to preserve the tissue sample from the injection site.

7   Exhibit 144, at pp. 28-30; *Higgs*, 126 Nev. ___, 222 P.3d at 660-61.

8         To obtain federal habeas relief based on an improper jury instruction, Petitioner must

9   establish that the instruction so infected the entire trial that the resulting conviction violates due

10   process.  *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993); *Estelle v. McGuire*, 502 U.S. 62,

11   72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).  In reviewing jury instructions, the court

12   inquires as to whether the instructions as a whole were misleading or inadequate to guide the jury's

13   deliberation.  *U.S. v. Garcia-Rivera,* 353 F.3d 788, 791 (9th Cir. 2003) (citing *United States v. Frega,*

14   179 F.3d 793, 806 n.16 (9th Cir. 1999) (internal citations omitted).  An instruction may not be judged

15   in isolation, "but must be considered in the context of the instructions as a whole and the trial

16   record." *Id.*  Furthermore, jurors are presumed to follow the instructions that they are given.  *U.S. v.*

17   *Olano,* 507 U.S. 725, 740 (1993).  Even if an instructional error is found, it is subject to harmless

18   error review.  *Calderon v. Coleman*, 525 US. 141 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619

19   (1993)).  The question is whether the error had a "substantial and injurious effect or influence in

20   determining the jury's verdict."  *Id.*

21         In the instant case, the Nevada Supreme Court declined to apply a civil trial rule and instead

22   recited the Nevada criminal rule regarding the loss of evidence.  Relief is only warranted "if the

23   defendant can show 'bad faith on the part of the government' or 'that he was prejudiced by the loss

24   of the evidence.'"  *Daniels v. State*, 114 Nev. 261, 267, 956 P.2d 111, 115 (1998) (quoting *Howard*

25   *v. State*, 95 Nev. 580, 582, 600 P.2d 214, 215-16 (1979)); Exhibit 144, at pp. 28-30; *Higgs*, 126 Nev.

26

___, 22 P.3d at 660-61.  In this case Petitioner did not allege bad faith on the part of the State, he merely suggested negligence.  Exhibit 117, at p. 32.  Accordingly, the Nevada Supreme Court reviewed the record to determine whether Petitioner had been prejudiced.  Exhibit 144, at pp. 29-30; *Higgs*, 126 Nev. at ___, 222 P.3d at 661.  The court concluded that Petitioner was not prejudiced. *Id.*  The court further concluded that because there was no violation of the law on the part of the State, the proposed instructions were unnecessary.  Exhibit 144, at p. 29; *Higgs,* 126 Nev. at ___, 222 P.3d at 661.

Petitioner claims that the Nevada Supreme Court's decision was an unreasonable application of *Matthews v. United States*, 485 U.S. 58 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). In *Matthews*, a case involving entrapment, the United States Supreme Court stated that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  485 U.S. at 63.  That case is irrelevant here, because the fact that non-exculpatory evidence may have been lost due to negligence on the part of the State is not a defense to murder.

In *California v. Trombetta*, the United States Supreme Court held that the Constitution imposes a duty on States to preserve evidence, when the evidence in question is both exculpatory and unavailable from other sources.  467 U.S. at 481-89.  The Nevada Supreme Court's decision in this case was not contrary to *Trombetta*.  As the United States Supreme Court held in *Arizona v. Youngblood*, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  488 U.S. 51, 58 (1988).  Petitioner did not allege bad faith, nor was the evidence at issue in this case exculpatory. Because Petitioner failed to show that the State violated his constitutional rights or otherwise acted in a way inconsistent with United States Supreme Court precedent, the Nevada Supreme Court's decision that the proposed jury instructions were unnecessary was not contrary to clearly established federal law, as determined by the United States Supreme Court.

22

1    Petitioner contends that the Nevada Supreme Court's decision was unreasonable because the

2    existence of different rules of jury instruction for civil and criminal cases violates equal protection.

3    This claim is without merit.  The Equal Protection Clause "creates no substantive rights," but rather,

4    "embodies a general rule that States must treat like cases alike but may treat unlike cases

5    accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  A civil litigant and a criminal defendant are

6    not "similarly situated" and therefore they are not entitled to identical treatment.  *See Cleburne v.*

7    *Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (the Equal Protection Clause "is essentially a

8    direction that all persons similarly situated should be treated alike").  Because Petitioner, a criminal

9    defendant, is not similarly situated to a civil litigant, the fact that different state rules exist in

10   criminal and civil contexts provides no basis for an equal protection claim.

11   The failure of the trial court to give the spoliation instructions proffered by Petitioner did not

12   violate his constitutional rights, and it certainly did not "infect the entire trial so that the resulting

13   conviction violates due process."  *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).  Even

14   assuming that the trial court's failure to give the spoliation instructions was in error, the error was

15   harmless, as it did not have a substantial and injurious effect or influence in determining the jury's

16   verdict.  *Calderon v. Coleman*, 525 US. 141 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619

17   (1993)).  The factual findings of the state court are presumed correct.  28 U.S.C. § 2254(e)(1).

18   Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was

19   contrary to, or involved an unreasonable application of, clearly established federal law, as

20   determined by the United States Supreme Court, or that the ruling was based on an unreasonable

21   determination of the facts in light of the evidence presented in the state court proceeding.  Federal

22   habeas relief is denied as to Ground 3 of the petition.

23        **D.  Ground Four**

24   Petitioner claims that his Fifth and Fourteenth Amendment right to due process was violated

25   because there was insufficient evidence to sustain his conviction.  (ECF No. 1, at pp. 6-7, 53-59).

26

23

1    When a habeas petitioner challenges the sufficiency of evidence to support his conviction, the

2    court reviews the record to determine "whether, after viewing the evidence in the light most

3    favorable to the prosecution, any rational trier of fact could have found the essential elements of the

4    crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jones v. Wood*,

5    207 F.3d 557, 563 (9th Cir. 2000). The *Jackson* standard does not focus on whether a correct guilt or

6    innocence determination was made, but whether the jury made a rational decision to convict or

7    acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Under the *Jackson* standard, the prosecution

8    has no obligation to rule out every hypothesis except guilt. *Wright v. West*, 505 U.S. 277, 296 (1992)

9    (plurality opinion); *Jackson*, 443 U.S. at 326; *Schell*, 218 F.3d at 1023. *Jackson* presents "a high

10   standard" to habeas petitioners claiming insufficiency of the evidence. *Jones v. Wood*, 207 F.3d 557,

11   563 (9th Cir. 2000).

12   Sufficiency claims are limited to a review of the record evidence submitted at trial. *Herrera*,

13   506 U.S. at 402. Such claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at

14   324, n.16). The reviewing court must respect the exclusive province of the fact-finder to determine

15   the credibility of witnesses, to resolve evidentiary conflicts, and to draw reasonable inferences from

16   proven facts. *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996). The district court must

17   assume the trier of fact resolved any evidentiary conflicts in favor of the prosecution, even if the

18   determination does not appear on the record, and must defer to that resolution. *Jackson*, 443, U.S. at

19   326. The United States Supreme Court has recently held that "the only question under *Jackson* is

20   whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."

21   *Coleman v. Johnson*, 132 S.Ct. 2060, 2065, ___U.S. ___ (per curium) (2012).

22   On direct appeal, the Nevada Supreme Court rejected Petitioner's claim of insufficient

23   evidence to sustain his conviction of first-degree murder:

24          Higgs argues that the evidence presented at trial does not support a
            conviction of first-degree murder. We disagree.

25

26

In reviewing the sufficiency of the evidence, we must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Rose v. State, 123 Nev. 194, 202, 163 P.3d 408, 414 (2002) (quoting Origel-Candido v. State, 114 Nev. 378, 381, 956 P.2d 1378, 1380)). We conclude that there was sufficient evidence to support Higgs' conviction.

The State presented testimony establishing that Augustine's death was not the result of natural causes but, rather, was the result of succinylcholine poisoning. Attending physician Dr. Mashour testified that routine tests at the hospital showed no signs of a stroke or heart attack. He testified that because succinylcholine was found in Augustin's ante mortem urine sample, succinlcholine poisoning was the likely cause of death. Two other physicians, Dr. Thompson and Dr. Katz, similarly testified that Augustine's death was a result of succinylcholine poisoning. In addition, Dr. Clark, the forensic pathologist who performed the autopsy on Augustine, also testified that in her opinion the cause of death was succinylcholine toxicity. She further testified that the drug could have been injected in such a manner as to go undetected. Dr. Clark testified that the autopsy revealed that Augustine's heart showed no signs of disease that would cause a massive heart attack. FBI toxicologist Montgomery explained that she found succinylcholine and its breakdown product, succinylmonocholine, in Augustine's urine sample. Montgomery testified that all three tests she ran on the urine sample tested positive for the presence of succinylcholine and succinylmonocholine. She further stated that it is not unusual that the drug was not present in Augustine's tissue sample because it is such a volatile chemical that the body acts quickly to break it down. The State also presented evidence that Augustine was not administered any succinylcholine at the hospital.

The State also presented evidence establishing that Higgs killed Augustine. Ramey testified that the day before Augustine was found unconscious, she had a conversation with Higgs during which he commented on a local murder trial saying, "That guy did it wrong. If you want to get rid of somebody, you just hit them with a little succs." Ramey testified that Higgs then made a gesture mimicking giving a person an injection. She further testified that Higgs explained to her that succinylcholine could not be detected postmortem. In addition to Ramey's testimony, the State presented circumstantial evidence of Higgs' access to succinylcholine. The substance is just one of the resources available to hospital staff like Higgs, who is an experienced nurse. Testimony established that succinylcholine is generally stored on crash carts, in emergency rooms, and in secured refrigerators, and while one needs a security code to access the refrigerated drugs, once accessed, additional drugs can be taken from the secured refrigerator without notice.

25

To build its theory that, as an experienced nurse, Higgs could easily obtain succinylcholine as well as other drugs, the State offered the testimony of Officer Jenkins. Officer Jenkins testified that when he executed the search warrant at the Higgs/Augustine home, he found the drug etomidate in a backpack in the master bedroom. Officer Jenkins testified that later, when executing the arrest warrant in Hampton, Virginia, the same backpack was in Higgs' possession and he collected it. He explained that this time the backpack contained a nursing book with a bookmark at the page concerning the administration of succinylcholine and a laminated 3" x 5" card with information concerning succinylcholine. Additionally, the State presented evidence that there was no hospital record of a missing vial of etomidate – even though a vial had indeed been found in the backpack in Higgs' home – establishing that drugs can be taken out of secured locations without notice.

The State also presented evidence of the deteriorated relationship between Higgs and Augustine. Witnesses testified that Higgs regularly used derogatory terms when referring to Augustine, he strongly disparaged his wife to Augustine's mother just days after Augustine's death, and he appeared unemotional throughout the ordeal. Additionally, Ramirez testified as to the flirtatious relationship that she had with Higgs and read from one of his e-mails in which Higgs stated that he wanted to drive Augustine crazy, he had plans in motion, and he would soon be free to be with Ramirez.

We conclude that, in addition to the medical evidence and the FBI toxicology report, there was other significant evidence presented to the jury – namely, Higgs' deteriorating relationship with his wife, his access to succinylcholine, and his own comments to Ramey – that was sufficient for any rational trier of fact to find the essential elements of first-degree murder beyond a reasonable doubt.

Exhibit 144, at pp. 13-16; *Higgs*, 126 Nev. at ___, 222 P.3d at 654-55 (emphasis in original). The Nevada Supreme Court applied the correct standard for sufficiency of the evidence challenges, pursuant to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). The factual findings of the state court are presumed correct. 28 U.S.C. § 2254(e)(1). Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling

1   was based on an unreasonable determination of the facts in light of the evidence presented in the

2   state court proceeding.  Federal habeas relief is denied as to Ground 4 of the petition.

3       **E. Ground Five**

4           Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights to due process and a

5   fair trial were violated by the cumulative impact of various instances of plain error.  (ECF No. 1, at

6   pp. 7-8, 60-66).  Petitioner raised this claim on direct appeal, and the Nevada Supreme Court rejected

7   the claim, as follows:

8           Higgs argues that a "prodigious" amount of plain error occurred during
            trial.  Higgs asserts 11 instances of alleged plain error, although he
9           does not fully brief the instances in detail and admits that counsel did
            not object to any of the 11 alleged instances of plain error.  The 11
10          claims of error are as follows: (1) during Ramey's testimony, she
            described Higgs as a "player" and testified that she thought he was a
11          "liar"; (2) Ramey testified that when she learned that Augustine had
            died, she thought Higgs had killed Augustine; (3) during Higgs'
12          testimony, the trial was delayed due to his second suicide attempt; on
            cross-examination, the State asked Higgs whether some people might
13          think that his during-trial suicide attempt was a ploy for sympathy and
            demonstrated consciousness of guilt; (4) during the same cross-
14          examination, the State asked Higgs what motive Ramey would have to
            make up her testimony; (5) during the same cross-examination, the
15          State asked Higgs if he disagreed with Dr. Clark's testimony, and
            Higgs said he did; (6) State witness Michelle Ene, Augustine's
16          executive assistant, testified that Higgs told her that he and Augustine
            had worked out their differences the night before Augustine was found
17          dead; Ene testified that she "didn't believe that for one minute" and
            was suspicious that Higgs may have had something to do with
18          Augustine's death and that he "might have murdered her"; (7) Nancy
            Vinnek, one of Augustine's best friends, testified in the rebuttal case
19          that Augustine frequently described Higgs as a "Doctor Jeckyll and a
            Mr. Hyde"; (8) during closing arguments, the State noted that Ramey
20          was a good witness; (9) during closing arguments, the State noted that
            Higgs could not explain why Ramey would testify as she did, and that
21          Dr. Richard Sehar, a State witness, who ordered the test to check for
            succinylcholine levels in Augustine's body, had testified that he
22          believed Ramey's testimony; (10) the State argued that Higgs admitted
            that his toxicologist, Walls, did not disagree with the FBI's conclusion
23          that succinylcholine was in Augustine's urine; and (11) during closing
            argument, the State said, "I know the defendant doesn't have the
24          burden . . . but he doesn't have a leash on him that prevents him from
            doing any of these things either."

25

26

27

1

2

3

4

5

          "Where an error has not been preserved," as in the case here because Higgs failed to object to any of the instances of alleged error, "this court employs plain-error review." Valdez v. State, 124 Nev. ___, ___, 196 P.3d 465, 477 (2008).  Pursuant to our plain-error review standard, "an error that is plain from a review of the record does not require reversal unless defendant demonstrates that the error affected his or her substantial rights, by causing 'actual prejudice or a miscarriage of justice.'" Id. (quoting Green v. State, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)).

6

7

8

          We have reviewed each of Higgs' claims of error and conclude that Higgs has failed to demonstrate how any of the alleged errors affected his substantial rights by causing actual prejudice or a miscarriage of justice.  We conclude that Higgs' plain-error argument is without merit.

9    Exhibit 144, at pp. 30-32; Higgs, 126 Nev. at ___, 222 P.3d at 661-62 (footnotes omitted).

10    Petitioner filed a motion for rehearing, contending that the Nevada Supreme Court had

11    misapprehended material facts and law in rendering its decision.  (Exhibit 137).  The Nevada

12    Supreme Court denied the petition for rehearing, ruling as follows:

13

14

15

          In his final assignment, Higgs argues that an accumulation of plain error deprived him of his constitutional right to a fair trial.  He contends that this court used an "individual error analysis" when it held that none of his multiple claims of error justified a reversal of his conviction.  Higgs misstates the order of affirmance.

16

17

18

19

20

21

          The actual heading in the order states "Accumulation of plain error," and accordingly, this court looked at the 11 instances of alleged plain error, none of which Higgs' counsel objected to, and concluded that the errors did not constitute an actual prejudice or miscarriage of justice.  This court applied the correct law in applying a plain error review, since Higgs had not preserved the issues for appeal by not objecting at trial.  We take this opportunity to note that the 11 instances of alleged error included a misstatement of testimony.  Higgs' final argument therefore lacks merit in that this court did not misapprehend the law in concluding that there was no accumulation of plain error warranting reversal of Higgs' conviction.

22    (Exhibit 141 at p. 9).

23          Petitioner argues that the Nevada Supreme Court's decision constituted an unreasonable

24    application of Estelle v. McGuire, 502 U.S. 62, 67-68, 70-73 (1991) (holding that while federal

25    habeas relief is not available for errors of state law, state law errors can violate the constitution if

26

they infect the entire trial in such a way that the resulting conviction violates due process), and

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutor's comments were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.").  Petitioner further asserts that *Chambers v. Mississippi*, 410 U.S. 284 (1973) establishes a cumulative error rule as a matter of federal law.  (ECF No. 1, at pp. 7-8, 60-66).

To the extent that cumulative error may be grounds for federal habeas relief, the Ninth Circuit has announced that: "[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).  This Court has reviewed the state court record and the pleadings filed by the parties, including all instances in which petitioner claims that error occurred.  Petitioner has not demonstrated that cumulative errors occurred, and even assuming that errors did occur, Petitioner has not shown that such errors resulted in a trial that was fundamentally unfair or that violated due process.

Finally, the factual findings of the state court are presumed correct.  28 U.S.C. § 2254(e)(1).  Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Federal habeas relief is denied as to Ground 5 of the petition.

**IV.  Certificate of Appealability**

In order to proceed with his appeal, Petitioner must receive a certificate of appealability.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1;  *Allen v. Ornoski,* 435 F.3d 946, 950-951 (9th Cir. 2006); s*ee also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001).  District courts are required to rule on the certificate of appealability in the order disposing of a proceeding

29

adversely to the petitioner or movant, rather than waiting for a notice of appeal and request for certificate of appealability to be filed.  Rule 11(a) of the Rules Governing Section 2254 and 2255 Cases.  Generally, a Petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (*quoting Slack*, 529 U.S. at 484).  In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*  In this case, no reasonable jurist would find this Court's denial of habeas relief debatable or wrong.  The Court therefore denies Petitioner a certificate of appealability.

**V. Conclusion**

  **IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus is **DENIED IN ITS ENTIRETY**.

  **IT IS FURTHER ORDERED** that Petitioner is **DENIED A CERTIFICATE OF APPEALABILITY.**

  **IT IS FURTHER ORDERED** that the Clerk **SHALL ENTER JUDGMENT ACCORDINGLY.**

  Dated this 15th day of October, 2013.

_____
UNITED STATES DISTRICT JUDGE

30